IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| FRANK PICKLE, | CV 18-00029-H-BMM-JTJ |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| DR. KOHUT, et al., | |
| Defendants. | |

Pending are the State Defendants' Motion for Summary Judgment (Doc. 49),

Defendant J.D. Moore M.D.'s Motion for Summary Judgment (Doc. 53), the State

Defendants' Motion to Strike Plaintiff's "Statement of Disputed Facts" (Doc. 61),

and Plaintiff Frank Pickle's Motion for a U.S. Federal Medical Hold (Doc. 69).

The Court finds that Defendants are entitled to summary judgment and that this

matter should be dismissed.  Mr. Pickle's motion for a medical hold will be denied.

## I.  MOTIONS FOR SUMMARY JUDGMENT

### A.  Standard

Summary judgment is appropriate when the moving party "shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed.R.Civ.P. 56(a).  Under summary judgment practice, "[t]he

moving party initially bears the burden of proving the absence of a genuine issue

of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)

(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B).  Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."

*Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966

(9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).

Defendants advised Mr. Pickle of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure in their November 8, 2019 notices (Docs. 52, 56) filed simultaneously with their motions for summary judgment. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## B. Facts[1]

### 1. Treatment at Crossroads Correctional Center

Mr. Pickle suffers from multiple significant health issues, including chronic obstructive pulmonary disease, gastroesophageal reflux disease, gout, hypertension, constipation, osteoarthritis in his left hip, and a neurogenic bladder. (State Defendants' Statement of Undisputed Facts, Doc. 51 (hereinafter "State

---

[1]Mr. Pickle filed a Statement of Disputed Facts. (Doc. 60.) The State Defendants move to strike the statement for failure to comply with Local Rule 56.1(b). The Court will not strike the filing but agrees that it does not specifically address the facts set forth by Defendants. Therefore, the facts set forth in Defendants' Statements of Undisputed Facts (Docs. 51, 55) are deemed admitted unless specifically disputed by Mr. Pickle or otherwise contradicted by the record. L.R. 56.1(d).

SUF") at ¶ 13.)

From 2009 to December 16, 2015, Mr. Pickle was housed at Crossroads Correctional Center in Shelby, Montana. (State SUF at ¶ 15.) On April 22, 2014, while Mr. Pickle was at Crossroads, he was evaluated by Dr. Rollin Bearss, MD, a urologist with Benefis Health System, for various urinary complaints including hematuria, nocturia, and urine retention. (State SUF at ¶ 16.) Based on further assessment including multiple CT scans, urodynamic testing, a cystoscopy followed by a voiding trial, and other examination, Dr. Brian Malloy, MD, a urologist with Benefis, diagnosed Mr. Pickle with a neurogenic bladder on March 4, 2015. A neurogenic bladder is a condition in which a patient lacks bladder control due to a neurological problem. Patients with urinary retention due to a neurogenic bladder commonly require a catheter to void urine. (State SUF at ¶ 18.)

Catheters can be suprapubic or urethral. A suprapubic catheter is surgically inserted through the lower abdomen wall below the umbilicus directly into the bladder. An indwelling suprapubic catheter may be placed permanently or temporarily depending on the patient's condition. Mr. Pickle's condition required a permanent catheter that had to be changed monthly. (State SUF at ¶ 20.) Mr. Pickle's catheter was inserted in a procedure on April 24, 2015. (State SUF at ¶ 22.) At a follow-up visit on May 18, 2015, Dr. Malloy recommended Mr. Pickle

take nitrofurantoin daily to prevent catheter-associated cystitis.  (State SUF at ¶ 33.)

Imaging taken at Marias Medical Center in Shelby, Montana, on August 7, 2014, and February 18, 2015, demonstrated advanced osteoarthritis in Mr. Pickle's left hip.  (State SUF at ¶ 24.)  Dr. Gregg Pike, MD saw Mr. Pickle at the Great Falls Clinic on March 26, 2015 for an orthopedic consultation.  Dr. Pike's diagnostic impression was left hip arthritis due to avascular necrosis and early left knee arthritis.  He stated that "this patient probably needs a total hip replacement at some point in the future," but that Mr. Pickle's catheter "would be risk with regards to possible infection risk around surgery.  I think this should be rectified before even considering any surgery."  (State SUF at ¶ 25.)

Dr. Michael Bryant, DO saw Mr. Pickle on November 9, 2015 at the Great Falls Clinic for another orthopedic consultation.  Dr. Bryant's encounter note also indicated that Mr. Pickle would likely need a hip replacement in the future, but that his suprapubic catheter should be removed prior to surgery if possible.  (State SUF at ¶ 26.)

## 2.  Treatment at Montana State Prison

On December 16, 2015, Mr. Pickle was transferred to Montana State Prison (MSP) in Deer Lodge, Montana.  Mr. Pickle was at MSP for less than six months.  (State SUF at ¶ 27.)  Mr. Pickle received a health assessment and physical upon his

arrival at MSP and was seen on numerous occasions by infirmary staff during his time at MSP for various ailments and for monthly catheter changes.  (State SUF at ¶¶ 28, 29.)  During Mr. Pickle's stay at MSP, the special needs committee approved several accommodations for Mr. Pickle regarding his joint pain, including a bottom bunk restriction, a wheelchair, and a walker.  (State SUF at ¶ 30.)  At a visit with Dr. Kohut on December 28, 2015, Mr. Pickle expressed concern that his nitrofurantoin prescription was being discontinued.  (State SUF at ¶ 31.)  Dr. Kohut told Mr. Pickle that the nitrofurantoin was being discontinued because it is an antibiotic and is not recommended for patients with no active signs of infection.  (State SUF at ¶ 32.)

When Mr. Pickle arrived at MSP, he was taking only ibuprofen 600-mg for pain, a non-steroidal anti-inflammatory drug commonly used to treat pain and inflammation.  Dr. Kohut kept Mr. Pickle on ibuprofen during his time at MSP.  (State SUF at ¶ 34.)  Mr. Pickle's medication administration records and kites reflect that he continued to receive ibuprofen throughout his time at MSP.  (State SUF at ¶ 35.)  Low-dose 81-mg aspirin is not typically used to treat pain but is prescribed to prevent heart attack and stroke.  (State SUF at ¶ 36.)  Dr. Kohut prescribed Mr. Pickle 81-mg aspirin in April 2016.  (State SUF at ¶ 37.)

### 3.  Treatment at Lewistown Infirmary

Mr. Pickle was incarcerated at Lewistown from May 9, 2016 until

approximately April 2019.  (Docs. 1, 18.)  Dr. Moore provided medical care to

inmates at Lewistown—including Mr. Pickle—during the relevant timeframe.

(Defendant J.D. Moore M.D.'s Statement of Undisputed Facts in Support of

Motion for Summary Judgment, Doc. 55 (hereinafter "Moore SUF") at ¶ 7.)  Dr.

Moore is a licensed physician authorized to practice medicine in the State of

Montana.  (Moore SUF at ¶ 6.)

When Mr. Pickle arrived at the Lewistown Infirmary, he was being treated

for the following medical conditions:  a suprapubic catheter, hypertension, gout,

and left hip pain.  (Moore SUF at ¶ 9.)  In light of these conditions and in

anticipation of Mr. Pickle's arrival, Dr. Moore ordered the following medications

(amongst others) for Mr. Pickle on May 3, 2016:  Acetaminophen and Ibuprofen

for pain; and Omeprazole ("Prilosec") and MI-Acid Suspension for GERD/

heartburn.  (Moore SUF at ¶ 10.)

Dr. Moore first saw Mr. Pickle on May 12, 2016.  (Moore SUF at ¶ 11.)

During this initial appointment, Mr. Pickle reported that he had been transferred to

Lewistown to facilitate left hip and knee replacement surgeries.  (Moore SUF at ¶

12.)  During his next appointment with Dr. Moore on June 28, 2016, Mr. Pickle

further reported that he required bladder reconstruction surgery.  (Moore SUF at ¶

18.)  These reports came as a surprise to Dr. Moore because Mr. Pickle's medical

records did not mention that Mr. Pickle was a candidate for joint replacement

surgery and there were no records of orthopedic or urologic consultations.  (Moore SUF at ¶ 18.)

Based on Mr. Pickle's reports, Dr. Moore began investigating Mr. Pickle's medical history and requesting Mr. Pickle's orthopedic and urologic records to determine whether the reported surgeries were medically indicated.  (SUF at ¶¶ 14, 18.)  Dr. Moore ultimately obtained Mr. Pickle's orthopedic and urologic records from 2015.  (Moore SUF at ¶¶ 15-18.)  These records reflected that left hip replacement was recommended due to osteoarthritis, but also noted that hip replacement could not be done until Mr. Pickle's suprapubic catheter was removed. (Moore SUF at ¶¶ 15-18.)  Mr. Pickle's orthopedic and urologic records did not reflect that a left knee replacement or bladder reconstruction surgeries were medically necessary or recommended.  (Moore SUF at ¶¶ 33, 40.)

Mr. Pickle was seen and/or treated by Dr. Moore on at least twenty occasions between May 2016 and January 2018 (excluding his monthly routine catheter changes performed by Lewistown medical staff).  Mr. Pickle's hip, knee, bladder, and/or associated pain were addressed (amongst other issues) during many of these encounters.  (Moore SUF at ¶ 20.)  Mr. Pickle's records also reflect that Dr. Moore arranged another round of orthopedic and urologic consultations during this time period.  (Moore SUF at ¶¶ 24, 26, 28.)

Dr. Moore examined and evaluated Mr. Pickle on May 12, 2016, reporting

that Mr. Pickle appeared "quite medically stable."  (Moore SUF at ¶ 11.)  Mr.

Pickle's left knee and hip were specifically discussed during this appointment.

(Moore SUF at ¶¶ 11-12.)  Dr. Moore examined and evaluated Mr. Pickle again on

June 28, 2016.  (Moore SUF at ¶ 18.)  During this examination, Mr. Pickle's left

hip, left knee, and bladder were again specifically discussed and evaluated, with

Dr. Moore again reporting that "Mr. Pickle's medical problems are being managed

and are under good control at this time."  (Moore SUF at ¶ 18.)  Dr. Moore also

indicated that they would contact Lewistown's physical therapy department to see

if they could "provide the postoperative physical therapy which will be necessary."

(Moore SUF at ¶¶ 12-18.)

On August 11, 2016, Dr. Moore and the Lewistown medical staff submitted

a Medical Preauthorization Request Form seeking a more recent orthopedic

consultation to obtain an updated assessment of whether joint replacement surgery

was appropriate.  (Moore SUF at ¶ 19.)  Although the orthopedic consultation was

difficult to schedule due to the unavailability of local providers (and other

providers declining Mr. Pickle's appointment request), Dr. Moore and the

Lewistown medical staff continued their efforts to obtain an orthopedic

consultation throughout the fall of 2016.  (Moore SUF at ¶¶ 20, 22, 23.)

Dr. Moore examined Mr. Pickle regarding his concerns and requests for

medical care on October 20, 2016.  Following this appointment, Mr. Pickle's

afternoon medications were discontinued at Mr. Pickle's request.  (Moore SUF at ¶ 21.)

Dr. Moore again evaluated Mr. Pickle on January 11, 2017.  Mr. Pickle's joint replacement and bladder reconstruction surgeries were again addressed during this appointment.  In connection with this appointment, Dr. Moore opined that Mr. Pickle did not appear to be a candidate for joint replacement surgery because Mr. Pickle did not complain of significant left hip pain, made no attempt to stand or walk, did not participate in any physical therapy aimed to strengthen him prior to any joint replacement surgery, and rarely took pain medication which only consisted of Tylenol or Ibuprofen.  (Moore SUF at ¶ 23.)

Mr. Pickle used a wheelchair at Lewistown Infirmary.  Mr. Fry, however, observed him able to walk with assistance from a walker in his cell and for short distances.  From Mr. Fry's observations, Mr. Pickle was capable of performing activities of daily living.  (State SUF at ¶ 49.)

On January 30, 2017, Dr. Bryant saw Mr. Pickle at the Great Falls Clinic for an orthopedic consultation.  (Moore SUF at ¶ 24.)  Dr. Bryant's encounter note indicates he informed Mr. Pickle that he has end-stage osteoarthritis in his left hip. Dr. Bryant also informed him he would need to get rid of his suprapubic catheter prior to any hip replacement surgery.  Mr. Pickle told Dr. Bryant he was going to be scheduled for "bladder reconstruction surgery."  Dr. Bryant indicated that this

would need to be done prior to any hip surgery.  (State SUF at ¶ 52.)

A suprapubic catheter poses a significant risk of infection when performing surgical procedures, including hip replacement surgery.  The close proximity of the catheter near the surgical site of a hip replacement creates an opportunity for contamination and infection of the joint replacement.  (State SUF at ¶ 53.)

Mr. Pickle did not have any "bladder reconstruction surgery" scheduled or recommended by any provider.  Mr. Fry is not aware of any provider or outside specialist who rendered an opinion that "bladder reconstruction surgery" could be performed at all, that it would address Mr. Pickle's neurogenic bladder or need for a suprapubic catheter, or that Mr. Pickle was a viable candidate for such a procedure.  (State SUF at ¶ 54.)

On February 7, 2017, following the orthopedic consultation with Dr. Bryant, Mr. Pickle was referred for a urology consultation with Brian Malloy, M.D., regarding suprapubic catheter removal.  (Moore SUF at ¶ 26.)  On February 22, 2017, Dr. Malloy informed the Lewistown medical personnel that he would not perform reconstructive bladder surgery or remove Mr. Pickle's suprapubic catheter for a hip replacement surgery.  (Moore SUF at ¶ 28.)

Dr. Moore examined again Pickle on March 2, 2017 and his progress note states:

> Mr. Pickle continues to be his usual garrulous self.  Of note, lately is
> his quest to get his right hip replaced.  He does not walk and rarely

stands and makes no effort as far as ambulation.  He takes almost nothing for pain.  He has a suprapubic tube in place which he came within in which we charge in intervals, and it has been not problematic at all.  Mr. Pickle was seen by an orthopedic surgeon in Great Falls recently.  The doctor was the same on (sic) that had seen him a couple of years ago and recommended hip replacement.  Once again he recommends hip replacement with the caveate (sic) that Mr. Pickle has to have his suprapubic tube removed. Mr. Pickle told this physician that he was teed up to have a bladder reconstruction.  He has been evaluated by Dr. Malloy a urologist from Great Falls and it is Mr. Pickle's contention that he is going to have bladder reconstruction is a figment of his imagination. Therefore, this is probably going to make hip replacement not something that the orthopedic surgeon will be willing to undertake.  Given Mr. Pickle's effort to rehabilitate himself and the fact that he does not walk would seem to me to make hip replacement contraindicated.

(Moore SUF at ¶ 30.)

Because Mr. Pickle had requested the hip replacement, on February 22, 2017 Mr. Fry submitted Mr. Pickle's case for review by the Montana Department of Corrections Medical Review Panel.  (State SUF at ¶ 57.)  The Medical Review Panel is a group of health care professionals designated to review complex health requests and cases, protested denials of care, and general issues related to offender health services and managed care.  (State SUF at ¶ 58.)  The Medical Review Panel typically reviews requests or recommendations for elective medical or surgical procedures or therapies.  (State SUF at ¶ 59.)  The Medical Review Panel reviewed Mr. Pickle's case on March 15, 2017.  Four physicians were in attendance.  (State SUF at ¶ 61.)  The Medical Review Panel meeting minutes state the following:

Offender was transferred from Shelby to Lewistown Infirmary

13

following discussion of a hip replacement while at Shelby.  He was been seen by Dr. Bryant, Ortho doctor at Great Falls Clinic, who will not do a hip replacement until the suprapubic catheter is removed and he did send a referral to the urologist who will remove the catheter for the hip replacement.  Offender does not complain of pain and does not participate in muscle strengthening exercises.  Will continue to monitor and encourage activity through physical therapy and increase stamina and endurance.

(State SUF at ¶ 64.)

The Medical Review Panel decided against recommending hip replacement at that time and instead recommended alternative treatment, consisting of continued clinical monitoring and encouraging activity through physical therapy. (State SUF at ¶ 65.)  There was no discussion by Mr. Fry or any Medical Review Panel members about the cost of the requested procedure.  (State SUF at ¶ 66.) Mr. Pickle was informed of the Medical Review Panel's decision on April 6, 2017. (Moore SUF at ¶ 31.)

Following the Montana Medical Review Panel's decision, Mr. Pickle's suprapubic catheter continued to be regularly treated and pain medications (Ibuprofen and Acetaminophen) continued to be prescribed and available at all times while Mr. Pickle was under Dr. Moore's care.  (Moore SUF at ¶ 32.) Notably, Mr. Pickle did not submit any medical requests relating to his operations or knee or hip pain after April 6, 2017.  (Moore SUF at ¶ 32.)

Mr. Pickle also was treated for GERD/heartburn while incarcerated at Lewistown.  (Moore SUF at ¶¶ 41-48.)  Mr. Pickle was prescribed 20 mg of

Omeprazole ("Prilosec") per day for GERD/heartburn when he arrived at
Lewistown in early May 2016.  (Moore SUF at ¶ 42.)  Mr. Pickle's Prilosec dosage
was increased to 20 mg twice per day on June 7, 2016, in light of Mr. Pickle's
heart burn related complaints.  (Moore SUF at ¶ 43.)  On June 7, 2017, Mr. Pickle
requested that he receive his 40 mg of Prilosec in the morning, rather than split
during the day—this request was granted.  (Moore SUF at ¶ 44.)  Despite
increasing Mr. Pickle's Prilosec dose and changing the timing of his medication,
Mr. Pickle continued to complain of heart burn on July 6 and 18, 2016.  (Moore
SUF at ¶ 45.)  On August 29, Dr. Moore changed Pickle's GERD/heartburn
medication from Prilosec to Pantoprazole ("Protonix") to "better handle [Mr.
Pickle's] heart burn."  (Moore SUF at ¶ 46.)  Dr. Moore also continued to make
MI-Acid Suspension available to Mr. Pickle for heartburn relief.  (Moore SUF at ¶
47.)

While incarcerated at Lewistown, Mr. Pickle also was treated for pain—joint
related and otherwise.  (Moore SUF at ¶¶ 50-56.)  Dr. Moore prescribed 600-mg
ibuprofen and acetaminophen for Mr. Pickle's pain management.  (Moore SUF at
¶¶ 10, 52.)  Mr. Pickle's medical records also reflect that pain management
medication was available to Mr. Pickle as needed and on request while he was
treated by Dr. Moore.  (Moore SUF at ¶ 53.)  On several occasions, however, Mr.
Pickle declined the option of taking acetaminophen and ibuprofen twice a day,

stating the evening pill pass interfered with television programs he wished to watch. As a result, the doctor discontinued his supper pain medication. (State SUF at ¶ 50.) Dr. Moore prescribed muscle rubs and a heating pad, which Mr. Pickle stated "would work," when Mr. Pickle complained of right neck and shoulder pain. (Moore SUF at ¶ 54.)

Mr. Pickle submitted 48 inmate requests ("kites") while incarcerated at Lewistown none of which complained that the management of Mr. Pickle's pain was inadequate. (Moore SUF at ¶¶ 55, 56.) Mr. Pickle's medical records also reflect that Mr. Pickle refused or declined his medication, including pain medication, on multiple occasions. (Moore SUF at ¶ 57.)

## C. Analysis

### 1. Eighth Amendment Medical Care Claims

To prove a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, a plaintiff must show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Thus, in order to prevail, Mr. Pickle must show both that his medical needs were objectively serious, and that Defendants possessed a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 299 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference."

*Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

It is obvious from the record that Mr. Pickle has serious medical needs. Therefore, the issue in this case is whether Defendants are being deliberately indifferent to those serious medical needs.  In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court established a demanding standard for "deliberate indifference."  Negligence is insufficient.  *Farmer*, 511 U.S. at 835.  Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety."  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted).  Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).  A physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id*.

Mr. Pickle contends Defendants were deliberately indifferent to his serious medical needs by (1) denying him a left hip replacement; (2) failing to provide him with "bladder reconstruction" surgery so he could get the hip replacement; (3)

failing to provide him with a left knee replacement; and (4) denying him proper medications for pain and heartburn.

### a. Surgeries

It is undisputed that Dr. Bryant recommended that Mr. Pickle get a hip replacement but it is also undisputed that Mr. Pickle's suprapubic catheter had to be removed before any hip replacement surgery could take place. (State's SUF at ¶¶ 26, 52.) Dr. Brian Malloy, the urologist who first placed the suprapubic catheter, advised Lewistown medical staff that his office could not remove the catheter for surgery. (SUF ¶ 55.) Mr. Pickle presented no evidence to dispute these facts.

Further, Mr. Pickle presented no evidence to suggest that he is a candidate for bladder reconstruction surgery. Defendants testified that there is no recommendation from any provider that "bladder reconstruction" would address his neurogenic bladder or permit the removal of his catheter, that Mr. Pickle would be a candidate for any such surgery, or that such a procedure even exists. (State's SUF at ¶¶ 54-56.) Given the inability to have the catheter removed, it was not deliberately indifferent to deny Mr. Pickle's request for hip replacement surgery.

Mr. Pickle may disagree with the Medical Review Panel's decision to deny hip replacement surgery but disagreement with medical treatment is insufficient by itself to demonstrate deliberate indifference.

> [A] mere difference of medical opinion ... [is] insufficient, as a matter of law, to establish deliberate indifference. Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to [the prisoner's] health.

*Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (internal quotations and citations omitted). Mr. Pickle disagrees with the determination that hip replacement surgery is contraindicated unless the catheter can be removed, but he made no showing that the decision to deny hip surgery was medically unacceptable or done in conscious disregard to an excessive risk to his health.

While Mr. Pickle also seeks damages for failure to provide knee replacement surgery, he presented no evidence to suggest that he needed knee replacement surgery. There is no recommendation in the record that Mr. Pickle needs knee replacement surgery.

Defendants met their burden of showing that there is no genuine dispute as to any material fact with regard to the denial of Mr. Pickle's requested surgeries. Mr. Pickle has not shown that a reasonable jury could return a verdict in his favor on these claims. Summary judgment should be granted on these issues.

### b. Medications

### i. Dr. Kohut

Mr. Pickle alleges Dr. Kohut "cancelled all the special pain/muscle medications that the outside doctors and medical special[ists]" had recommended.

According to Defendants, Mr. Pickle has since clarified his allegation is that Dr. Kohut discontinued his prescriptions for aspirin 80-mg, Tylenol 500-mg, and ibuprofen 800-mg which were intended to treat his pain.  (Doc. 1 at p. 21-22; Pl.'s Resp. to State Defs.' Interrogs. # 4, Ex. L at pp. 3, 11, 19-20.)

The Court first notes that Mr. Pickle was only under Dr. Kohut's care for less than six months between December 16, 2015 and May 9, 2016.  Further, Dr. Kohut's testimony and the record establish that Dr. Kohut did not discontinue any pain medications for Mr. Pickle.  When Mr. Pickle arrived at MSP, he was taking only ibuprofen 600-mg and Mr. Pickle continued to receive ibuprofen throughout his time at MSP.  (State's SUF at ¶¶ 34-35.)  Mr. Pickle contends in his Statement of Disputed Facts that Dr. Kohut lowered his dosage of medications from 600 mg of ibuprofen to 400 mg of ibuprofen and discontinued his prescription for nitrofurantoin.  (Doc. 65 at 6-7.)  However, again, Mr. Pickle has not shown that this decision was medically unacceptable under the circumstances.

Dr. Kohut admitted that Mr. Pickle's prescription for nitrofurantoin was discontinued.  But he testified that nitrofurantoin is an antibiotic and its continued use is not indicated for patients with permanent suprapubic catheters.  Mr. Pickle's procedure to insert the suprapubic catheter was done on April 24, 2015 and he showed no active signs of infection.  (Kohut Affidavit, Doc. 51-4 at ¶ 16.)  Again, "[a] difference of medical opinion between a prisoner-patient and prison medical

authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Gauthier v. Stiles*, 402 Fed.Appx. 203 (9th Cir. 2010) (plaintiff's disagreement with the dosage and type of pain medication administered after surgery not deliberate indifference).  The mere fact that Mr. Pickle or even his prior medical providers had a different opinion regarding the use of nitrofurantoin does not plausibly support an Eighth Amendment claim.

Instead, as set forth above, Mr. Pickle must demonstrate that Dr. Kohut's decision to discontinue the nitrofurantoin in December 2015 (eight months after the placement of his catheter when Mr. Pickle had no signs of infection) was medically unacceptable and done in conscious disregard to an excessive risk to Mr. Pickle's health.  *See Toguchi*, 391 F.3d at 1058.  Mr. Pickle has not presented sufficient evidence to make this showing and overcome Dr. Kohut's testimony regarding why his discontinued the nitrofurantoin.  Further, there is no indication that Mr. Pickle suffered an infection or any other ill effect from the discontinuation of nitrofurantoin.

Dr. Kohut met his burden of showing that there is no genuine dispute as to any material fact with regard to the denial of certain medications to Mr. Pickle. Summary judgment should be granted on these issues.

### ii.  Dr. Moore

Mr. Pickle alleges that Dr. Moore's denial of certain pain medications and his decision to change his GERD/heartburn medication from Prilosec to Protonix violated his rights under the Eighth Amendment.  (Doc. 1 at 11, 24.)  But again, as with Dr. Kohut's medication decisions, there is no evidence to suggest that these decisions were medically inappropriate or done in conscious disregard of an excessive risk to Mr. Pickle's health.

Mr. Pickle alleges that Dr. Moore told him that the medication necessary to control his pain were too costly and if aspirin or Tylenol or ibuprofen did not work then he was out of luck.  (Complaint, Doc. 1 at 24.)  Mr. Pickle asserts that only "high intense drugs such as Tylenol 3 with codeine, morphine, and codeine" are effective against his pain.  (Response, Doc. 57-1 at 2.)  Dr. Moore made a decision to treat Mr. Pickle's pain with over-the-counter type medications and ensured that Mr. Pickle had access to ibuprofen and acetaminophen on an as needed and on request basis.  (Moore SUF, ¶ 53.)  While Mr. Pickle disagrees with this decision, he failed to demonstrate that Dr. Moore treatment of any complaints was medically inappropriate or in conscious disregard to his health.  *See Fausett v. LeBlanc*, 553 Fed.Appx. 665 (9th Cir. 2014) (affirming summary judgment for defendants where doctors did not provide Valium ordered in hospital-discharge instructions after spinal-fusion surgery and instead provided substitute medicine and other pain

medications); *Shiira v. Hawaii*, 706 Fed. Appx. 436 (2017) (affirming summary judgment for defendants who deprived plaintiff of methadone and Percodan but offered over-the-counter pain medication and treatment for potential detoxification symptoms; plaintiff's expert did not testify that offering alternative pain medications would be medically inappropriate).

In addition, it is undisputed that Mr. Pickle did not submit any kites requesting changes or increases in his pain management medications.  (Moore SUF, ¶¶ 50, 56.)  The Court has reviewed the record and only located two kites submitted by Mr. Pickle which even make mention of pain.  On May 18, 2016, Mr. Pickle complained of pain in his neck.  (Health Care Request, Doc. 55-19 at 50.)  It is undisputed, however, that Dr. Moore prescribed muscle rubs and a heating pad when Mr. Pickle complained of neck and shoulder pain.  (Moore SUF, ¶¶ 52, 54.) Mr. Pickle also complained of pain regarding his catheter on July 27, 2016 and a visit was scheduled with his provider.  (Doc. 55-19 at 38.)  There are no specific complaints in the record where Mr. Pickle complained of the pain at issue in this lawsuit.

Mr. Pickle did submit testimony from another inmate that Mr. Pickle complained to Lewistown medical staff many times about his pain which were largely ignored.  (Ball Affidavit, Doc. 57-2 at 6.)  But Mr. Pickle did not provide any documentary evidence of such complaints or any evidence that Dr. Moore was

aware of these complaints of pain.  He simply failed to establish a genuine issue of material regarding the denial of pain medications.

The same analysis applies to Mr. Pickle's allegation that Dr. Moore failed to adequately treat his heartburn.  It is undisputed that Dr. Moore changed Mr. Pickle's GERD/heartburn prescription from Prilosec to Protonix.  (Moore SUF, ¶ 46.)  But it is also undisputed that this medication change followed Dr. Moore's receipt of several kites relating to the ineffectiveness of Prilosec to treat Mr. Pickle's GERD/heartburn, and increases to Mr. Pickle's Prilosec dosage and timing on June 7 and 23, 2016.  (Moore SUF, ¶¶ 43-44.)  Despite these changes, on July 6 and 18, 2016, Mr. Pickle submitted additional kites requesting a special diet due to his heartburn.  (SUF, ¶ 45.)  Dr. Moore therefore changed Mr. Pickle's GERD/heartburn medication to Protonix "to better handle [Pickle's] heart burn." (Moore SUF, ¶ 46.)

Mr. Pickle's contention that Dr. Moore's decision to change this medication was done to better handle Mr. Pickle's heartburn is "not true" (Doc. 57 at 10) is simply insufficient to overcome Dr. Moore's undisputed evidence explaining his medical reasoning for changing this medication.  Mr. Pickle has not demonstrated that this decision was medically unacceptable or done in conscious disregard of an excessive risk to Mr. Pickle's health.

There is simply insufficient evidence in the record to establish Dr. Moore

deliberate indifference regarding to Mr. Pickle's medical issues.  Dr. Moore should be granted summary judgment on these claims.

### 2.  Access to the Courts

"Prisoners have a constitutional right of access to the courts."  *Silva v. Di Vittorio*, 658 F.3d 1090, 1101 (9th Cir. 2011) *overruled on other grounds as stated in Richey v. Dahne*, 87 F.3d 1202, 1209 n. 6 (9th Cir. 2015).  This right includes "both a right to meaningful access to the courts and a broader right to petition the government for a redress" of a prisoner's grievances.  *Id.* at 1102.  The Ninth Circuit differentiates between claims involving a prisoner's right to affirmative assistance, which is limited to the tools necessary to attack a sentence and "challenge the conditions of ... confinement," and claims regarding a prisoner's right to litigate without active interference.  *Id.*

In *Lewis v. Casey*, 518 U.S. 343, 349-52 (1996), the Supreme Court explained that an "actual injury" must arise before a prisoner has the standing to assert either right.  An "actual injury" occurs when there is a "specific instance" in which a prisoner was denied access.  *Id.* at 349.  The injury requirement is "not satisfied by just any type of frustrated legal claim."  *Id*. at 354-55.  It is only satisfied when an inmate is denied access with regard to a direct appeal from his conviction, a habeas petition, or a civil rights action.  *Id.*  "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional)

consequences of conviction and incarceration." *Id.* at 355.

In *Silva*, the Court found an "actual injury" where prison officials repeatedly transferred an inmate between prison facilities and withheld his legal documents to prevent him from litigating various pending lawsuits.  658 F .3d at 1104.  As a result, several of the inmate's suits were dismissed.  *Id.*

Mr. Pickle alleged in his Complaint that Dr. Moore told him that if he filed a grievance or lawsuit on him or any other person he would be locked in isolation room with all his personal property confiscated and/or destroyed and accident can happen.  (Complaint, Doc. 1 at 24.)  But "[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983." *Oltarzewski v. Ruggiero*, 830 F.2d at 139 (citation and internal quotation marks omitted); *see also Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) (stating that "verbal harassment generally does not violate the Eighth Amendment"), *amended on other grounds by* 135 F.3d 1318 (9th Cir. 1998); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (a "mere naked threat" from prison guards does not violate the Eighth Amendment).

Mr. Pickle also claims Defendant Johnson and Officer Shaffer, on January 15, 2018 confiscated and tore up his court papers, mail from attorneys and took all his pens/pencils and copies of court cases, medical records, and affidavits that he wanted to use in this case.  He alleges this did irreparable damage to this case.

(Complaint, Doc. 1 at 28.)  In his Statement of Disputed Facts, Mr. Pickle contends he has witnesses who will testify that they saw Officer Johnson throw his materials away.  (Doc. 65 at 2.)  However, it is insufficient in a response to a motion for summary judgment to simply contend there are witnesses who will testify for him at trial.  To establish the existence of a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11.  Mr. Pickle has not submitted any admissible evidence to support this claim.

Further, the Court finds insufficient evidence to suggest that an incident on January 15, 2018 when Mr. Pickle may have been deprived of materials and documents has caused irreparable injury to this case.  In fact, Mr. Pickle signed his Complaint on January17, 2018, just two days after the alleged incident.  Since that time Mr. Pickle has demonstrated his ability to litigate this matter by his multiple filings.

Mr. Pickle presented no evidence to establish that he suffered an "actual injury" to support his right to access the courts claim.  Defendants should be granted summary judgment on this claim.

27

### D.  Conclusion

Defendants met their burden of proving "that there is an absence of evidence to support" Mr. Pickle's claims.  *See Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B).  Mr. Pickle, in turn, failed to establish that a genuine issue as to any material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). There is a complete failure of proof concerning several essential elements of Mr. Pickle's claims necessitating entry of summary judgment.  *See Celotex*, 477 U.S. at 322.  He has not tendered any evidence to establish deliberate indifference to his serious medical needs or that he was denied access to the courts.  Simply stated, Mr. Pickle presented insufficient evidence to overcome Defendants' motions for summary judgment.  Mr. Pickle provided no evidence to demonstrate that a reasonable jury could return a verdict in his favor.  See *Anderson*, 477 U.S. at 248. Defendants are entitled to summary judgment.

## II.  MOTION FOR U.S. FEDERAL MEDICAL HOLD

Mr. Pickle filed a petition seeking a "U.S. Federal Medical Hold" seeking an order requiring that (1) he be allowed to remain at the Riverside Special Needs Unit, (2) that he not be sent to a different facility so the Court will be able to find him for court, (3) that he be allowed to have his operations done at Benefis Health Systems in Great Falls, Montana, (4) that he be allowed to talk about court process

with his witness James Ball, and (5) for Mr. Ball to be allowed to be with him in court.  (Doc. 69.)

The Supreme Court has cautioned the federal courts not to interfere with day-to-day operations of prisons, especially those decisions related to security, a task which is best left to prison officials who have particular experience in dealing with prisons and prisoners.  *See Turner v. Safley*, 482 U.S. 78 (1987).  In light of the recommendation that this matter be dismissed, the Court will not interfere with Department of Corrections' decisions regarding the placement of Mr. Pickle.

Based upon the foregoing, the Court issues the following:

## ORDER

1.  The State Defendants' Motion to Strike Plaintiff's "Statement of Disputed Facts" (Doc. 61) is DENIED.

2.  Mr. Pickle's petition seeking a federal medical hold (Doc. 69) is DENIED.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  The State Defendants' Motion for Summary Judgment (Doc. 49) should be GRANTED.

2.  Defendant J.D. Moore M.D.'s Motion for Summary Judgment (Doc. 53) should be GRANTED.

3.  The Clerk should be directed to enter judgment and close this matter.

4.  The Clerk of Court should also be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[2]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed until entry of the District Court's final judgment.

DATED this 23rd day of April, 2020.


      */s/ John Johnston*

John Johnston
United States Magistrate Judge

---

[2]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Pickle is being served by mail, he is entitled an additional 3 days after the period would otherwise expire.